Ms. Owens v. State of Georgia, Governor's Office of Student Achievement Good morning, Your Honors, and may it please the Court. My name is Cheryl Legree, and I represent the appellate here, Nicole Owens, in her claims under the Rehabilitation Act and the Pregnancy Discrimination Act against the Governor's Office of Student Achievement, the State of Georgia. We're here today because on October 11, 2018, GOSA terminated my client rather than accommodate her pregnancy and childbirth-related disabilities under the Rehab Act. Can I ask you a question that, and this is a question I do not know the answer to, and I've looked. What was the disability that affected your client? Why could she not come into work? Well, as an initial matter, Your Honor, there's no argument below at all that Ms. Owens did not suffer a disability. No, no, no. It's not at all that individual. I totally agree with that. However, the disability... I want to be clear about that. What was argued below is that it was required to say what the disability is for the purposes of deciding on a reasonable accommodation claim. That was argued. Yes, Your Honor. So, what is the disability? The disability was pregnancy-related complications that led to childbirth complications, including a cesarean section and blood transfusions. Okay. Those are conditions and procedures. That's not a disability. Lots of people have blood transfusions, have no disability. Lots of people have children and have no disability. Lots of people have cesarean sections and have no disability. What is the disability? And the disability, and I ask that because it's defined explicitly in the statute. It is a physical impairment, physical or mental impairment, that substantially limits a major activity. Yes, Your Honor. Okay. What's the substantial impairment? Was it substantial? What evidence is it substantial? And what physical limitations did it cause? I mean, where was that ever given over to the State? Well, the State had doctor's notes that said that my client had a cesarean section. Right. My client shared with her supervisor. And that she was doing well. My client shared with her supervisor, Your Honor, that she had had childbirth complications. Okay. Let's break, counsel, let's break this down. I know all of it. Trust me. We're going to break down each note. August, I'm sorry, the first note, the August note, says your client had a cesarean section. She's doing well. She may work from home. She may work via teleworking or via at home. Okay. A cesarean section is a procedure, not a disability. Would you agree with me? Not exactly, Your Honor, because under, specifically under Judy v. A. G. D. O. J. 482, Federal Appeals 517, this Court in 2012. Federal Appendix, you mean? Yes. Right. And Mayorka v. Alorica, Inc., which is a case, 212 U.S. District, Lexington, 103-766, Southern District of Florida, July 25th, 2012. While pregnancy is generally not considered a disability, a pregnancy-related impairment may be considered a disability if it substantially limits a major life form. There's no doubt that's true. That's not my question to you. Is a cesarean procedure, a cesarean section, is that itself a disability? The cesarean standing alone was not a disability. Okay. So what, at least for the August note, what GOSA knew, I'll use GOSA as your, since you used that acronym, what GOSA knew was there was a cesarean section and she was doing well. That's not all that GOSA knew. Okay. We're just talking about that note. Just on the basis of the note. Right. If you exclude my client's communications. We're going to get there. I'm going to get there. Just on the basis of the note, yes, Your Honor. Okay. The September note. Let's just talk about the September note. All it said was, to whom it may concern, she may go back to the office or may go back to the office in now. Correct? Yes, Your Honor. Is there any indication of what the disability is? From that note, only looking at that note? Only looking at that note on its face, no. Okay. So then let's go to where I know you want to go, which is the communication. So as I understand it, T.O., Ms. T.O., was told, who is the direct supervisor, not the decision maker, but the direct supervisor, was told that she had complications from pregnancy and that she had, is it two blood transfusions, was she told two? Two blood transfusions. Two blood transfusions. How are those things, let me ask you this, how is Ms. T.O. to know that those meet the definition of disability, which is a mental or physical impairment which substantially limits major life activities? Well, Your Honor, that presupposes that Ms. T.O. had to know that it was a disability under the statute. Well, what it presupposes is that there's a requirement when you make a reasonable accommodation to give two things. As I understand it, there's at least two things which I think you all agree on. One is, what is the disability? You have to say, this is my disability, and you have to communicate the reasonable accommodation. That seems to be the minimum of what the law requires, and at that point, the burden is then on the employer to do something. But let's assume that's the baseline. Where is the disability, where in, she had complications from pregnancy, and she had two blood transfusions, is there any indication of impairment of a major life activity? Well, the, we would argue yes, Your Honor, based on the fact that her doctor did not release her to return to the office. Well, but she was allowed to work. In fact, I have to say, based on these complications and everything else, she's allowed to work almost immediately after she has her kid. I mean, under the first note, August 3rd, she has released, she has said they're doing well, and she has released to work. So I'm having trouble understanding how that's, now work is clearly a major life function. So if she wasn't allowed to work, that would, you'd have a case. But I'm worried about, what I don't understand is, how you not communicate what the major disability, what the disability is, and then somehow expect to trigger this thing just to say, I want to work from home. I'm missing something there. Well, Your Honor, if you look at Holly v. Clareson, for example, they talk about the EEOC guidance, where someone just says, I need to seek medical treatment for my back. Well, just seeking medical treatment for your back doesn't identify a specific disability. Agreed. And that's enough to trigger the notification standard, which means you proceed to the next part of the process. Well, so in Morley, not Morley, in Moraski, in Moraski, which is cited by the parties, in Moraski, there the employee, I believe he was applying for a job, said, I can't read. I mean, certainly that's a major life function, not being able to read. And what we there said is, that's not enough, because he didn't say what the disability was. He didn't say, I can't read because I have a mental or physical impairment. He simply said, I can't read. Now, you have a bit of the opposite problem. You give the medical issue, cesarean section, complications from pregnancy, blood transfusion, but where's the impairment on, where's the discussion of any impairment on a major life activity? Well, a cesarean section is major surgery or even separate and apart. I don't doubt it. You're talking to a father of two children. I understand. I don't dispute that at all. But I think you and I would agree that for some women, they recover almost immediately. And for some women, it takes a long time to recover. And both are fine, but that has to be communicated to your employer that I can't work. I'm suffering from this. My doctor has told me I need to stay in bed for two weeks. I can't leave my bed, so I can't do my job. That's a different story than, I had a cesarean section, I'm doing well, I am cleared to work via computer at home. That is not cleared to work from the office. And Felicia Lowe, the Governor's Office of Student Achievement has a policy under which, and the state has a policy under which, if you need a reasonable accommodation, you report that to Human Resources. Here, Felicia Lowe. Felicia Lowe testified. Clearly, I knew from the doctor's notes that her need to work from home was medically necessary. She made the link. She understood. And that she wasn't going to second guess Ms. Owens' physician's position here. And Ms. Owens was communicating directly with Ms. Lowe. And under the policy, it was Ms. Lowe's job to communicate with Dr. Good. The assumption has to be at summary judgment, where you take the inferences in favor of the plaintiff, and Ms. Lowe was communicating with Dr. Good. Can anyone from GOSA call your client's doctor? Absolutely, Your Honor. I'm glad you raised that issue. Let me ask it this way. Right now, can I call your client's doctor? Me. I pick up the phone and say, I'd like to speak about Ms. Owens. Ms. Owens didn't sign a release for you. She signed a release for GOSA. Okay. Let's talk about that. So, as I understand it, on September 20th, some documents were given to your client regarding the interactive process. One of those was a release. Yes, Your Honor, it was. And as I understand the record, that release was not signed at any point through at least October 11th. That's a misstatement of the record, Your Honor. And I would like to clarify that point, and I'm glad you raised it. I'm my client's deposition at page 165. I'm sorry. I'm looking for the right page. She specifically said on page 166, I have the paperwork that I have to sign and give authorization along with submitting the form, printing that out, and signing that, submitting all of that information to the Records and Release Department. And from there, it is out of my hands. She testified that she turned that paperwork in to Kaiser. Later in the deposition, opposing counsel asked my client when she said, I told them they could talk to my doctor. Well, did you sign a release for GOSA? My client didn't give it to GOSA, but my client did give it to Kaiser. And Felicia Lowe testified, yes, I could have picked up the phone and called Kaiser. I didn't do it. So, this goes, it seems to me, more to the interactive process issue. You agree with me that's less relevant with regard to the initial burden of your client to disclose a disability and the accommodation. The accommodation is clearly given. I need to work from home. Does the release issue have anything to do with whether she communicated what her disability was? I think the two issues are separate. We provided supplemental authority on Williams versus the Veterans Administration. The two issues are separate, but notice is a very low bar, even under this court's case law, under Holly. Very low bar. And we relied on Chevron from the Fifth Circuit in our briefing because it was so close to this case. But the same would apply here. My back's hurt. I need treatment. But even in Chevron, there was a lot more discussion of what, A, what the accommodation was, which you have here, and B, what the disability was. They gave a pamphlet disclosing exactly what the limitations were for what he had, right? The plaintiff did, in that case, do that in conjunction with the doctor's note that said only the following. She needs to work from home for two weeks. The release said only this. She needs to be transferred to a substation closer to home. Nothing else. Thank you, counsel. Thank you. Thank you, Your Honor. This is not a case about whether childbirth is a serious medical event. It is. But the question in reasonable accommodation cases is whether the employee's functional limitations make a particular accommodation necessary. Informing your employer that you've had a difficult C-section delivery does not mean the employer knows what work-related limitations you might have. It was a little more than that, though. I mean, there was a cesarean birth. She communicated to Ms. Teo, who at some point got to Ms. Good, because Dr. Good writes it in her memorandum of, I think it's October 10th, that says that she had complications. She communicated she had two blood transfusions as a result. Tell me, what more would have gotten her there? Like, what's the next step that gets her to where she needs to be? So, she would need to talk about the functional limitations she had on her ability to do its job that flowed from those medical conditions. So, for example... Let me ask you this. At some point, is it not reasonable for a certain medical condition, and it may not be for a cesarean section, but at some point to just assume that's the case? Sure. I think there are medical conditions where, by their very nature, the limitations that flow from them are open and obvious. Give me an example. So, for example, if you lose a limb, I think the limitations resulting from losing a limb are open and obvious. If you're requesting an accommodation for that, you don't have to specifically say, you know, I can't walk normally because I'm missing a leg.  I had surgery in order to have a child. I have had complications from that surgery, to the point that I've had two blood transfusions, not in sort of the open and obvious that it limits me in some way from doing my job. Plus the fact that I need an accommodation. I need to work from home, and I'm not cleared to go to the office. Is that not enough? No, you're right. So, there's no dispute that a difficult cesarean delivery is the kind of thing that could create limitations, but the fact that there were complications, that there were blood transfusions doesn't tell GOZA what those limitations were, which is the point of the reasonable accommodation process. What about the doctor's note? I mean, that's what's kind of odd. I feel like the doctor is saying, this is when she can return to work. So, isn't this, because there's the doctor's note saying this is when she can return to work, isn't this at least a little bit like the leg losing situation where there's a doctor saying, I've assessed this person. I'm not being really specific about it, but I've assessed this person, and I'm telling you as a doctor, November is when she can return to the office. I think the difference in the missing limb situation is that the employer knows that the limb is missing. They're on notice of the disability, and because they are on notice of the disability, they know what kind of limitations flow from that. That's not the case here. All that GOZA knows is that a doctor said she's doing well, she may return to work, but she may not return to the office until November 5th. That doesn't give them any idea of the limitations they're dealing with. In other words, what I understand you're saying is that goes to the accommodation side of it. In other words, the accommodation is, I need to work from my computer at home, and I need to do so for two months. It's still missing the disability side of it. It is a reasonable accommodation, which means not only must there be identifying disability, but there must be a basis for the employer to analyze, meaningfully analyze that request. Is this actually necessary? Are there alternative accommodations? That is the point of this analysis. One weird thing to me about this case is that you conceded that she was disabled. Could you just address that concession? My recollection of the briefs below is that we didn't contest that point. I'm not sure that we, I think we just said it's better resolved than the point that she never made a specific request. I think the reason for that is because we still don't know to this day whether she was disabled or not. That's not something that's in the record. It certainly was never communicated to GOZA. We don't really have a basis to dispute that. She may have been disabled. The problem is not that she was or was not disabled. It's that she didn't communicate that. I read her deposition, and there was a key moment in her deposition where she was asked about this. I didn't understand her answer, basically. I get your point there. I go back to the doctor's note. If a doctor is saying this person has some condition, I'm not disclosing what the condition is, but that condition requires this particular modification, this particular accommodation, I just go back to the idea why would the employer need more than that? The Rehabilitation Act and the ADA, of course, these are the same. Only obligating the employer to comply with the known physical and mental limitations of otherwise qualified individuals. It's built into the standards that have to be communicated to the employer. You're quoting the statute, which says that. That's from the statute. If the doctor is saying, look, I've already got the accommodation that she needs. I'm a medical officer. I've looked at her. I've examined her. I understand her condition. Here's the accommodation that she needs. Why as a practical matter, and I guess this is just a practical question, why as a practical matter would an employer need anything more than that to decide what to do? It's not hard to accept a doctor's ultimate conclusion about whether an accommodation is reasonable or not. Of course, the employer has to take as a given the medical diagnosis that the doctor has given, but they don't have to agree with the ultimate conclusion that teleworking is the only way to accommodate those limitations, whatever they are. Let me ask a follow-up on Judge Brasher's hypothetical. Let's say the doctor's note says, I am not disclosing the condition because of HIPAA issues and because my patient has asked me not to, but it results in her not being able to walk for a significant amount of time, and therefore, she's requesting an accommodation for X, Y, and Z. Would that be sufficient? I think not being able to walk is a major limitation. In other words, all you have to do is identify what the disability is, which is not the condition, but an impairment that substantially limits a major life activity. As long as you say that there is an impairment, you don't have to disclose what that impairment is, that substantially limits a major life activity, that meets the burden. As long as you identify the functional limitations. To be clear, we're talking about the initial request stage. Certainly in the interactive process, the employer might ask for further... Let's talk about that. Assume for the moment we think that there was the doctor's notes along with what Ms. Owens communicated to her employer is sufficient to have started the process. Did GOSU give enough time for this thing to play out before pulling the plug? It seems that... Let me ask it this way. If the plug had been pulled... I think either the magistrate judge or the district court says this. If the plug had been pulled after the July 3rd or the July 4th email where it was said, hey, I need some more time with my doctor, and they said, sorry, you're out, that probably wouldn't be sufficient. Would you agree? No, I don't. A couple of points on this, Your Honor. First of all, this had been a week-long process at this point. And of course, that's setting aside that Ms. Owens had been teleworking for... This is a how long process? A week's long process. I believe it was September 14th that after the second doctor's note, GOSU came back and said... So let's break it down even more specifically. So September 14th, the request is made, and then at some point, I think it's pretty soon after, Ms. Owens writes back and says, hey, my doctor's out of town until the 24th. So there's not much I can do until then. So it's hard to hold against her from the 14th to the 24th when there's no availability for her to be able to get the information from the doctor, right? Sure. Okay, so then we're talking about the 24th until the 3rd or 4th, which is, I'm not a mathematician, 10, 11 days? Does that sound about right? Is that a yes? Okay. All right, so is that enough time? So, Your Honor, I think it's important to step back a little bit here and think about the information that GOSU was actually asking for. Nothing about what they were asking for was something that necessarily had to be provided by the doctor. The limitations that Owens was dealing with is something that she herself should have been able to communicate. Now, she may have communicated that, and GOSU may have come back and said, we understand that, but we need further medical documentation. Is that true for the forms that she was given? So as I understand it, at least some of those forms did require some sort of medical documentation. The reasonable accommodation form itself is directed at the employee. It's telling them what are the related things you can't do, tell us the disabilities that mean you can't do that, and tell us about the accommodation that would allow you to do this. It includes two attachments. One of them is a release form that allows GOSU to talk to the doctor. Do you agree she signed the release form and gave it to Kaiser? Because I didn't see a signed release form in the record. That's not my understanding of the record, Your Honor. You don't think there's a signed release form in the record? All right, let's go to a deposition testimony. Does she actually say, I signed it and gave it to Kaiser? Do you think that's in the deposition? I had it that she could sign a release for GOSU to contact a physician, but she didn't sign it because GOSU never asked for it. But that's a little ambiguous. I don't know what she's talking about. She didn't sign it and give it to them. I understood that it was never signed, but maybe. That's my understanding, Your Honor. And I think even on the record that my colleague has provided, the form was provided to her doctor, not to GOSU, but, of course, if the release is to give GOSU permission. But do you know whether she signed it and gave it to the doctor? I hereby release you.  I did not see record evidence of that. Do we have medical records from that doctor other than these two notes? Not to my knowledge. There's no other medical evidence anyway? No, my recollection is after the process. Nothing from Kaiser? No, nothing came in. Okay. Have I got the timeframe? Because we talk about these things, but the C-section was on July 18th. That is correct. And she returned to work remotely on August 6th or what day, 19 days later. Is it August 3rd or August 6th? I believe she gave a doctor's note on August 3rd, saying she was cleared to come to work that next Monday. So she was able to work on the 6th, and then she was working remotely, and she was supposed to come back September 11th. Was there some understanding she was supposed to come back, and that's when she asked to November 5th, or there was no understanding about when she was coming back? So in her deposition, Owen says that before she gave birth she agreed with, I think, her supervisor, someone at GOSA, that she'd be able to telework briefly after giving birth, with the understanding that that was because until her baby was six weeks old, she didn't put her in child care, and they didn't want to force her to choose between a paycheck and staying home with her child. And with the further understanding that at about six weeks, they would follow up and revisit. It's not abundantly clear in the record, but that's my understanding of why there was a September note. So she was supposed to come back in six weeks from the remote part, is what you're saying? The initial thing at the beginning was that that initial permission to telework was to allow her baby to grow to six weeks. As I understand the record following up on that, there was some concern in the beginning of September about the quality of the work that was coming in because of the remote work, and at that point, I think Ms. Good told Ms. Teo to reach out and see, hey, when are you coming back, and that's what triggered the second note. Is that your understanding of how this played out? I think that's accurate, yeah. Back to the interactive process. So we were talking about how long is enough. So I think you agree with me that at least starting in September 24th, that's a fair assessment of when to start the clock. And then by October 3rd or 4th, there's a sort of take it or leave it, tell us tomorrow or you're done sort of demand. Is that reasonable as part of the interactive process, assuming nothing happened after that? Sure. So I don't think that the standard is whether it's reasonable or not. I mean, again, to take a step back here, GOZA is not potentially liable, even if this court were to find that it did not engage in the interactive process. In fact, that's not a fine that GOZA is liable under the Rehabilitation Act. They're only liable if there was a reasonable accommodation that was possible that they did not provide. This court's made clear in a number of cases that. I understand. But let me be clear, though. The requirement to engage in a reasonable interactive process has a reasonableness element to it as well. In other words, it can't be a sham. That's right. There's a good faith obligation of the employer to engage in that process. And I think that to answer your specific question, if there had been a one-day deadline and then nothing further, that's probably not good faith. Okay. And I appreciate that. So that's not what happened. She says, I need more time. And they said, okay, 10 more days. And then at the end of 10 days, she says on October 9th, I think she sends an email and says, I'm still getting everything together. And then by October, I think, 11th, when they check in on her, she says, I haven't been able to get everything together. And that's when the termination letter is sent. Yeah, she says, you know, I don't have the documentation. I don't know when it's going to come. I'm not going to come into the office tomorrow to discuss my termination. Right. She didn't ask for an extension. She didn't say, I think this is when I will get the records. She didn't offer any alternative, you know, meeting accommodations, anything like that. Is that a sufficient amount of time, though, to allow the interactive process to play out if they're asking for at least some medical information, even if it doesn't require a doctor's note or anything else? Yes, Your Honor. I think it is. Again, the information that Goza is asking for is kind of like the fundamental requirement to begin the interactive process, which is what are the limitations you're dealing with. And that's something that Owens herself could have spoken to. Thank you very much, Counsel.  Thank you, Your Honor. The first thing I want to address is this. As stated by the court in Mayorga v. Alorica, where a medical condition arises out of a pregnancy and causes an impairment separate from the symptoms associated with a healthy pregnancy or significantly intensifies the symptoms associated with a healthy pregnancy, such a medical condition may fall within the ADA's definition of disability. And here, I don't think it's disputed that she didn't have typical symptoms of pregnancy or even typical symptoms of a cesarean section. I think in the timeline, it's really important to state, Your Honors, that no specific deadline was ever given to her until October 1st. There's no dispute that once she asked on September 14th for reasonable accommodation paperwork, because it was never given to her, they just said, Get your doctor to write something else. Without telling her what it is they wanted her doctor to write. Wait a minute, I'm going to stop you there. I've got the email on September 20th. They email her all the paperwork. I just went back to the paperwork. Most of it is all for her to fill out. It's just an employee fills it out and says, Here's my problem, and here's what I can't do, and here's my request. And then it does have at the back a medical release. But the paperwork is all for her to fill out, and I didn't see where she filled out any of it. She got it on September 20th. I don't know that it matters here. I just need to know, is it correct she didn't fill this out and didn't send any of it back to GOSHA? No, Your Honor. It's for her to fill out and give to her doctor, not to give to GOSHA. It's reasonable accommodation paperwork that GOSHA asked her, sent to her on September 20th. So it's not for her to return back to GOSHA. Correct. It's for her to send to Kaiser to get the medical information that GOSHA was requesting from Kaiser. They didn't send that to her until September 20th, even though on September 12th they told her they wanted to know whether it was medically necessary or a personal preference. What do we make, though, of – GOSHA seemed to be accommodating and give more time when she asked for it. But third, what do we make of the email on the 9th, I'm getting the paperwork together, and then radio silence until they check in on the 11th and she says, I don't have the paperwork and I'm not coming into the office. I think there's a really important point that we haven't raised yet here, though, Your Honor. According to Felicia Lowe, my client could not return to the office under GOSHA's policies. She was not released to return to work. There was no documentary or medical evidence. Now let me ask you about that. I have a question about that. So you're talking about under FMLA, because she took FMLA leave, she was not released. She needed a doctor's note to be released. Wasn't the doctor's note that said she could work from home, didn't that release her from FMLA? She wasn't on FMLA while she was working from home, was she? She wasn't, Your Honor. Okay. But Felicia Lowe specifically testified that because she had taken FMLA leave, until her doctor released her to return to the office, she was not allowed to return to the office. So I thought the policy, the written policy, is different than that. I know you sort of slip in office there, but as I understand the written policy is you need a doctor's note to return to work, correct? It does say return to work, Your Honor. And she does have a note as early as August 3rd stating she's doing well and cleared to return to work, correct? Your Honor, she did. And to return to work, tell her not to return to the office. I understand, but to return to work. And Ms. Lowe's testimony is she had to have a note that said she could come back to the office. Okay. Yes. I want to go back to these forms because I want to make sure I understand them because you were very helpful in clarifying these were not to go back to GOSHA. These were all forms. All these forms were only to go to the health care provider. Okay. Do we have in the record a signed form by her that she signed this request and sent it to the doctor? First of all, let's just deal with the signed form. Is there a signed form in the record? Apparently they're not. The signed form is not on there. So I have to look to her deposition testimony? Yes, Your Honor. And you're saying the deposition testimony is going to tell me that she signed these forms and sent them to the doctor? Yes, Your Honor. And when did she send them to the doctor? The evidence, documented evidence in the record shows that she submitted them to Kaiser on September 24th. Okay. Then I have one more question. The FMLA leave, and that goes back to whether she really was on FMLA leave after the birth. I thought she was on FMLA leave like eight months before the birth because she was on full leave because of the pregnancy. Is that correct? Correct, Your Honor. She had intermittent leave because of her pregnancy complications. Okay. So she didn't. January 1, 2018. Through the time she gave birth where she took continuous leave. Okay. And really she had run out of her FMLA leave and her paid leave off. That's really what happened here. Is that correct? No, Your Honor. She had not run out of FMLA. Now, she was led to believe she had run out of FMLA. Okay. She ran out of paid leave and would have had to have gone on unpaid leave. Okay. And they offered to let her go on unpaid leave. She was qualified for FMLA through September to be on continuous leave. Okay. So the question is, was she on FMLA leave or was she authorized to return to work by that first note? That's the question. Why is she not authorized to return to work and the FMLA leave is over as of whatever date? She came off FMLA leave to telework on August 6, 2018. She is off FMLA leave. That's right. All right. So you don't dispute the FMLA leave. Okay. Yeah, that's one year, I think, or something. You get up to one year. That's why you're saying she's not out of it. She had hours available to her, about 255, but they did not tell her that. They led her to believe she was out of FMLA time. Okay. But she didn't bring an FMLA leave violation. It is a mean from FMLA suits for damages, Your Honor. Okay. All right. But she's out of FMLA leave. Excuse me. She is no longer on FMLA leave as of August the 6th. That's right. She's working full time starting August 6th. Okay. Released to return to work in the office November 5th. Okay. Thank you. That clarifies it. Thank you. Thank you, Counsel. Thank you. Call the next case.